**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BENJAMIN PATRICK, | ) | CASE NO.  1:09-cv-00661 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| v | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | | |

Claimant, Benjamin Patrick ("Patrick"), challenges the final decision of the Commissioner of Social Security ("Commissioner"), denying Patrick's  applications for a period of Disability Insurance Benefits ("DIB") under Title II Of the Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 423 and 42 U.S.C. § 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is REVERSED and REMANDED.

## I.  Procedural History

Patrick filed his applications for DIB and SSI on August 29, 2005 alleging disability beginning April 12, 2005.  His applications were denied initially and upon reconsideration.  Patrick timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Richard N. Staples, held a hearing on July 31, 2008, at which Patrick, who was represented by counsel, and Barbara E. Burk, vocational expert ("VE") testified.  The ALJ issued a decision on October 9, 2008, in which he determined that Patrick was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Patrick filed an appeal to this Court.

On appeal, Patrick claims the ALJ erred: (1) by failing to give controlling weight to the opinion of Patrick's treating physician; and (2) in his determination of Patrick's residual functional capacity.  The Commissioner disputes Patrick's claims.

## II.  Evidence

### A.  Personal and Vocational Evidence

Patrick was born on August 5, 1956.  Transcript ("Tr.") 53.  He was 51 years old at the time of his hearing.  Patrick has a high school education.  (Tr. 72).  Patrick has past relevant work as a hospital cleaner, lead glass seamer, and automobile tester.  (Tr. 779-784).

### B.  Medical Evidence

On January 21, 2005, Patrick presented to Marymount Hospital ("Marymount") complaining of right knee pain.  X-rays revealed an unfused apophysis at the superior

2

lateral aspect of the patella. No acute pathology was detected and a bipartitie patella was noted.  (Tr. 177, 200).  Patrick was diagnosed with a knee sprain and underwent a physical therapy evaluation.  The therapist noted Patrick's rehabilitation prognosis was good.  (Tr. 177-178).

On February 4, 2005, Patrick presented to Marymount emergency room complaining of right knee pain.  Patrick stated he injured his knee on January 18, 2005 when a Christmas tree pole was twice pushed into his knee.  (Tr. 174-175).

On March 12, 2005, Patrick presented to his primary care physician, Ghai C. Lu, M.D. complaining of cough with phelgm and increased wheezing after he ran out of medicine.  Examination revealed end expiratory wheezing, and Patrick was diagnosed with an asthma exacerbation.  Patrick reported that the medicine helped his symptoms, and the doctor gave Patrick new prescriptions.  (Tr. 213-214).

On August 22, 2005, Patrick presented to Dr. Lu complaining of mild shortness of breath and cough.  He had been out of his inhaler for one week.  Dr. Lu prescribed Prednisone and an Albuterol inhaler and advised Patrick to quit smoking.  (Tr. 157-158).  Patrick presented for three follow-up visits complaining of cough and shortness of breath.  Examination revealed wheezing and Patrick's prescriptions were renewed.  Dr. Lu continued to advise Patrick to quit smoking.  (Tr. 158, 161-162, 297-298).

On October 24, 2005, Sally Felker, Ph. D. performed a psychiatric consultive examination of Patrick.  Patrick reported a history of alcohol, cocaine, and marijuana abuse.  He stated that he last used alcohol a year ago, and he last used cocaine a year and a half ago.  He had received some treatment for substance abuse.  Patrick reported restless and interrupted sleep.  He stated that he had crying spells almost daily and

admitted depression, some anxiety, reduced energy level, and reduced interest in his surroundings.  (Tr. 206-208).

Patrick reported that he was basically homeless.  He lived in his car, which he parked in his parents' yard.  He stated that his father did not want him to live at home because he did not have a job.  Patrick reported that his mother would wake him up and make breakfast for him.  He sometimes would go to his parents' home in the morning, and sometimes he used the phone to look for work.  If he were home during the day, he might watch television.  (Tr. 206-208).

Patrick reported that he would go with his friends to the local bar to help them set up for Karioke.  He would also stay late to take the equipment down.  Patrick reported going to church on Sundays, Mondays, and Thursdays; occasionally he sang at church. Patrick reported difficulty reading because of poor concentration.  (Tr. 206-208).

Dr. Felker noted that Patrick's ability to concentrate and his attention span were somewhat restricted.  His insight and judgment were marginal to fair.  Dr. Felker diagnosed depressive disorder, NOS and assigned Patrick a GAF score of 56[1].  Dr. Felker opined that Patrick was mildly restricted in his ability to concentrate.  He was not impaired in his ability to follow instructions.  He was minimally impaired in his ability to relate to and deal with others and the general public.  He was moderately impaired in his ability to relate to work peers and supervisors and to tolerate the stresses of

---

[1]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

employment.  (Tr. 206-208).

On October 31, 2005, Patrick presented to Dr. Lu.  He was assessed with end expiratory wheezing and leg edema.  Dr. Lu diagnosed asthma exacerbation and prescribed Prednisone.  (Tr. 211-212).

On February 20, 2006, state agency reviewing psychologist Douglas Pawlarczyk completed a Psychiatric Review Technique.  He opined that Patrick was mildly limited in his ability to perform daily living activities; maintain social functioning; and maintain concentration, persistence, and pace.  (Tr. 237)  Dr. Pawlarczyk disagreed with the psychological consultive examiner's finding that Patrick was moderately restricted in some area, finding instead that Patrick was no more than mildly limited.  (Tr. 239).

On March 8, 2006, Adi Gerblich, M.D. examined Patrick at the request of the state agency.  Patrick's chief complaints were asthma and depression.  Patrick reported daily coughing, wheezing, and shortness of breath.  He reported occasional chest pain and occasional sputum production.  Pulmonary function tests showed mild obstructive ventilatory defect.  A chest X-ray showed signs of a previous left lung surgery and mild thoracic spine degenerative joint disease.  Dr. Gerblich's impression was bronchial asthma, alleged; depression, alleged; knee trauma, by history.  Dr. Gerblich opined that Patrick had mild obstructive ventilatory defect which should pose no significant functional limitations.  (Tr. 242-243).

On April 2, 2006, Patrick presented to South Pointe Hospital ("South Pointe") emergency room complaining of breathing trouble.  He had run out of his medications over the past two weeks.  (Tr. 258, 260).  Patrick was diagnosed with acute exacerbation of chronic obstructive pulmonary disease ("COPD")/ asthma.  (Tr. 261).

5

On April 6, 2006, state agency reviewing physician Willa Caldwell completed a physical residual functional capacity assessment.  Dr. Caldwell opined that Patrick had no limitations other than to avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. 274-281).

On June 3, 2006, Patrick presented to South Pointe emergency room complaining of wheezing.  He was diagnosed with acute asthma exacerbation.  (Tr. 283-284).  It was noted that Patrick was using his inhaler incorrectly.  (Tr. 284).

Between November 29, 2005 and July 17, 2006, Patrick was treated at  NorthEast Ohio Neighborhood Health Service, Inc. for breathing difficulty.  (Tr. 293, 297-299, 301,303).  On May 22, 2006, Patrick was given two aerosol treatments.  (Tr. 301). He was prescribed Prednisone on July 14, 2006. (Tr. 302).  Patrick was advised to stop smoking.  (Tr. 298).

From July 2006 to December 2006, Patrick presented to Dr. Turoff four times. He was noted to have bilateral wheezing at each visit.  (Tr. 714-715).

On July 27, 2006, Patrick presented to South Pointe emergency room complaining of shortness of breath.  Patrick reported that his symptoms had worsened with an increase in the humidity, and his inhaler was not providing relief.  Examination revealed wheezing.  Patrick was diagnosed with asthma exacerbation and bronchitis. He received three aerosol treatments.  (Tr. 312,314,317).

On August 12, 2006, Patrick presented to South Pointe emergency room complaining of chest pain, vomiting, and burning epigastric pain.  (Tr. 319-320).  Patrick admitted to smoking cigarettes and to smoking cocaine that evening.  (Tr. 321).  Patrick was admitted to the hospital where he underwent an esophagogastroduodenoscopy

6

which revealed ulcerative esophagitis and hiatal hernia.  (Tr. 333).  A CT of the chest revealed parenchymal scarring in the lung bases and distal esophageal wall thickening.  (Tr. 350).  An echocardiogram revealed mild pulmonary hypertension, mild left ventricular hypertrophy, mildly decreased ejection fraction at 45%, and mild tricuspid regurgitation.  (Tr. 358).  Patrick was given Albuterol treatments.  (Tr. 361-362).

On September 11, 2006, Patrick presented to South Pointe emergency room with coughing, wheezing, and dyspnea.  Examination revealed bilateral wheezes and diminished breath sounds.  (Tr. 367, 377).  Patrick was diagnosed with acute asthma exacerbation.  He received aerosol treatments.  (Tr. 370, 375).

On September 24, 2006, Patrick presented to South Pointe emergency room complaining of coughing, wheezing, shortness of breath, and chills.  (Tr. 381).  Examination revealed rhonchi and occasional wheezing.  (Tr. 381A, 385).  Patrick was diagnosed with bronchitis and bronchospasms.  (Tr. 382).

On February 13, 2007, Patrick presented to the Veterans Administration ("VA") for a medication refill and evaluation.  (Tr. 484).  Patrick reported that he is able to walk one to two flights of stairs.  He complained of chronic intermittent knee pain.  A chest X-ray taken that day revealed no cardiac enlargement and no active pulmonary pathology.  Knee X-rays taken the same day were normal.  (Tr. 387-388).

On May 8, 2007, Patrick presented for a mental health assessment at the VA.  (Tr. 472).  Patrick reported that he was homeless and had been living at the Salvation Army since December 2006.  He participates in their substance dependence program.  (Tr. 466).  Patrick reported that he has chronic asthma and GERD which interfere with

7

his life.  However, during the past 30 days, these problems bothered him only slightly.
(Tr. 467).  Patrick reported experiencing serious depression during the past 30 days and
during his lifetime.  (Tr. 471).

On July 5, 2007, Patrick was admitted to the VA.  The progress notes for that day
list reason for admission as, "vet is homeless and has substance abuse issues and
would like opportunity to work on housing and employment."  (Tr. 447).  The next day,
Patrick was diagnosed with cocaine, alcohol, marijuana, and nicotine dependence, and
his GAF score was assessed as 48[2].  (Tr. 442-443).

On August 13, 2007, Patrick presented to the VA for a scheduled appointment.
He complained of chronic knee and foot pain.  He stated that he was not getting relief
from his present asthma medication, and his wheezing is increasing and is irritated by
air conditioning.  (Tr. 409).

On August 20, 2007 Patrick had a vocational assessment at the VA.  (Tr. 402).
He was noted to have no physical or mental limitations.  It was noted that he was
working full time as an escort.  (Tr. 402).

On August 24, 2007, Patrick's comprehensive treatment plan was reviewed.  (Tr.
397).  Patrick reported that he had been depressed in the past, but he was not currently
depressed.  He still continues to isolate himself.  (Tr. 399).  Patrick was diagnosed with
cocaine, alcohol, marijuana, and nicotine dependence, and his GAF score was
assessed as 48.  (Tr. 400).

---

[2]A GAF score between 41 and 50 indicates serious symptoms or a serious
impairment in social, occupational, or school functioning.  A person who scores in this
range may have suicidal ideation, severe obsessional rituals, no friends, and may be
unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*,
at 34.

8

On August 27, 2007, Patrick presented to the VA for follow-up for his asthma. He reported feeling better since taking Medrol, and doing better in air conditioned areas. He complained of chronic knee and foot pain.  (Tr. 396).

On August 31, 2007, a therapeutic work program evaluation was completed for Patrick.  The evaluator indicated that Patrick was doing 90% of his work up to standard, and that his work seldom needed to be corrected.  He was usually diligent but needed some encouragement.  Patrick learns rapidly and needs little re-instruction.  He is tactful, promotes cooperation, and handles supervision and criticism well.  He has no unexcused absences and is never tardy.  (Tr. 393).

Mr. Patrick was involved in group therapy for his cocaine and alcohol addiction where urine tests were taken.  (Tr. 391, 395, 401, 404, 413, 415, 418, 433, 437, 458-461, 661, 664, 670, 702).  He was discharged from the VA after a curfew violation on September 17, 2007 with diagnoses of nicotine dependence, cannabis abuse, and cocaine/alcohol dependence in early full remission.  (Tr. 497).

On September 25, 2007, Patrick presented to the VA emergency room complaining of respiratory difficulties.  Patrick reported that he was out of his inhaler, and the only medication he takes reliably is his Albeuterol inhaler.  Examination revealed inspiratory and expiratory wheezes and limited air exchange.  Patrick was given a nebulizer treatment and released.  (Tr. 689-691).

On October 5, 2007, Patrick presented to the VA complaining of depression. Patrick reported nine months sobriety.  The psychiatrist noted that Patrick had multiple issues of narcissistic injury.  He further noted that Patrick was cooperative with a constricted affect.  His insight was improving, and his judgment and motivation were fair.

9

Patrick was diagnosed with nicotine dependence, cocaine and alcohol dependence in early full remission, and cannabis abuse.  He was assessed with a GAF score of 42. (Tr. 633-684).

On October 9, 2007,  Patrick presented to the pulmonary clinic with diffuse expiratory wheezing.  (Tr. 681).  Pulmonary function tests revealed an FVC score of 3.86 and an FEV1 score of 1.80.  (Tr. 681).  The doctor's assessment included poor asthma symptom control on current medications.  However, Patrick reported that he had been feeling pretty well on Singulair and Advair. The doctor noted Patrick probably had some airway remodeling due to smoking/superimposed COPD.  (Tr. 681).  Patrick stated that he was ready to quit smoking.  (Tr. 681).

On October 25, 2007, Patrick presented to the VA for an orthopaedic consultation.  (Tr. 666-667).  Patrick reported intermittent left knee pain for the last 20 years, with intermittent worsening.  (Tr. 667).  He reported particular problems walking up inclines, going upstairs, or jumping.  (Tr. 667).  Patrick reported that Ibuprofen gave him mild relief.  He had never had physical therapy.  (Tr. 667).  Patrick's most recent knee x-rays revealed no evidence of fracture, dislocation, or osteoarthritic changes.  (Tr. 667).  Patrick's most recent left knee MRI was normal with a lateral meniscus cyst.  (Tr. 667).  Upon examination, the doctor observed that Patrick was in no acute distress, had normal gait, and had full extension of his left knee.  (Tr. 667).  Patrick had some tenderness upon palpation of his patellar tendon at rest, but he had no tenderness at full extension.  (Tr. 667).  The doctor assessed Patrick as having patella tendonitis and bursitis.  (Tr. 667).  The doctor recommended continued anti-inflammatory medications, rest as needed, icing, and undergoing aggressive physical therapy for quad

10

strengthening and hamstring balancing.  (Tr. 667).  He advised Patrick to return in three

months if he is still having symptoms.  (Tr. 667).

On November 15, 2007, Patrick presented to internal medicine complaining of

subjective fevers, increased use of his rescue inhaler, and increased coughing.

Examination revealed diffuse wheezing.  The doctor was concerned that Patrick would

have an exacerbation so he prescribed Prednisone.  He also noted that Patrick had

decreased his smoking.  (Tr. 658-659).

On November 21, 2007, Patrick presented to the emergency room with

gastroenteritis.  Examination revealed mild end-expiratory wheezes bilaterally.  (Tr.

652).

On December 13, 2007, Patrick presented to Dr. Jones for a psychiatric evaluation

of his insomnia and fatigue.  Patrick reported that he had run out of Trazadone one

week prior and was having difficulty sleeping.  He was sleepy during the day and had

fallen asleep on the job a few times in the past few days.  He also reported family

stressors that may be worsening his mood.  Dr. Jones noted that Patrick had been sober

since admission, and his alcohol and cocaine dependence were in early full remission.

Patrick reported that the Amantadine had helped his cocaine cravings; however, the

doctor noted that Patrick continued to smoke one pack of cigarettes a day despite his

worsening asthma and insomnia.  Dr. Jones diagnosed Patrick with adjustment disorder

with depressed mood vs. depression NOS; insomnia; nicotine dependence; cocaine and

alcohol dependence in early full remission; cannabis abuse; rule out narcissistic

disorder; arthritis; and asthma.  Dr. Jones assigned Patrick a GAF score of 55.  (Tr. 634-

636).

On December 18, 2007, Patrick presented to the VA.  He reported good benefit from Advair and Singulair.  He stated that he had run out of Singulair about a month prior and was experiencing increased shortness of breath and wheezing.  His asthma was assessed as moderate persistent.  (Tr. 631).

On December 27, 2007, Patrick's counselor noted Patrick becomes somewhat grandiose and then becomes depressed.  The counselor noted that Patrick had become more withdrawn at group meetings and indicated that Patrick would be monitored for depression.  (Tr. 624).

On January 8, 2008, Patrick presented to the emergency room complaining of cough with sputum.  Examination revealed bilateral wheezes, and he was diagnosed with bronchitis.  (Tr. 618-620).

On January 11, 2008, Patrick presented to Dr. Jones complaining of depression.  Dr. Jones noted that Patrick's affect was constricted; his memory, judgment, and motivation were fair; and his insight was improving.  He had been sober for 13 months, but Dr. Jones noted long standing issues with self medication with cocaine and alcohol.  Dr. Jones assigned Patrick a GAF score of 42.  (Tr. 615-616).

On January 17, 2008, Patrick presented to the VA for a routine follow-up appointment.  Patrick reported a cough producing greenish thick phlegm, shortness of breath when climbing stairs, and increased use of Albuterol since he had a cold.  (Tr. 613).

On January 31, 2008, Patrick presented for a counseling session.  The counselor noted that Patrick had made minimal progress and continued to have behavioral difficulties and difficulties at the work site.  The counselor opined that Patrick was very

limited in his ability to gain full time employment due to physical barriers.  (Tr. 606).

On February 5, 2008, Patrick presented for a psychiatric evaluation.  Patrick reported that his depression had lessened since January.  He stated that he becomes depressed due to situational stressors, such as delays in obtaining housing and other social stressors.  He is quite sensitive to interpersonal rejection or criticism, and his reaction can be intense.  He is discouraged about problems at his employment program but is otherwise unspecific about the reasons for his feelings.

The evaluating psychiatrist noted that Patrick does not have major depressive episodes or manic or hypomanic episodes.  Patrick was diagnosed with adjustment disorder, alcohol and cocaine dependence in sustained full remission, and cluster B traits.  The psychiatrist assigned Patrick a GAF score of 55.  (Tr. 603-604).

Also on February 5, 2008, Patrick presented to the emergency room complaining of shortness of breath for the prior five hours.  Patrick reported that he was taking his medications as prescribed.  Patrick was given aerosol treatments, prescribed Prednisone, and released.  (Tr. 598-600).

On February 7, 2008, Patrick presented for a routine follow-up.  Upon examination, scattered end expiratory wheezes were noted.  The examiner noted that Patrick was currently getting over an exacerbation and had not been taking his baseline medications correctly.  Patrick was counseled on how to properly use his medications.  (Tr. 590-592).

On February 19, 2008, Patrick presented for a psychiatric appointment.  Patrick reported experiencing stress because he did not like his transitional housing; he did not like his roommates or being told what to do by staff.  He was also stressed by the

13

uncertainty of finding permanent housing and by his lack of income.  Patrick reported feeling mildly depressed and irritable most days, particularly if he felt he had been disrespected.  Patrick reported decreased concentration and the one time use of cocaine in the last month.  The examining resident noted that Patrick was cooperative and interactive.  His speech was clear, distinct, and fluent.  His mood was mildly dysthymic.  His affect was full.  His thought process was organized, and his thought content was rational and future oriented.  His perceptions were intact, his judgment was fair to good, and his insight was fair.  Patrick was diagnosed with adjustment disorder, alcohol and cocaine dependence in sustained full remission, and cluster B traits.  He was assessed with a GAF score of 55.  (Tr. 576-579).

On March 24, 2008, Patrick presented for a psychiatric appointment.  The examiner noted that Patrick had been dismissed from transitional housing for failing to return by curfew.  Patrick reported that he was trying to get social security benefits, and that he was having a difficult time getting the VA doctor to sign the paper work.  He also reported that he was seeking employment at the VA.  Patrick reported drinking two nights during the past week after learning he might not be able to get his social security paper work signed.  He did not feel well after drinking and realized it was not something he wanted to do.  The examiner tried to discourage Patrick from taking a job as a security guard at a bar given his past drug and alcohol dependence and anger issues.  (Tr. 546-547).  However, Patrick did take the job.  (Tr. 545).

On April 7, 2008, Patrick presented for a psychotherapy appointment.  Patrick reported feeling significantly better since leaving transitional housing and feeling more in control of his emotions.  (Tr. 545-546).

14

On April 21, 2008, Patrick presented for a psychotherapy appointment.  He reported that he had moved into an apartment.  He had been robbed at gunpoint and reported some suicidal ideation after that.  Patrick reported being stressed about an upcoming child support hearing, but he felt he was in better control of his anger.  ( Tr. 542-543).

On May 19, 2008, Patrick presented for a psychotherapy appointment.  Patrick was concerned about being jailed for failure to pay child support.  He stated that he might commit suicide if he had to go to jail.  He was diagnosed with cocaine, alcohol, and cannabis dependence all in early remission and cluster B traits.  (Tr. 514-516).

On April 29, 2008, Patrick presented to a podiatrist for painful toenails.  Upon examination, the podiatrist noted normal muscle strength 5/5 in Patrick's lower extremities.  (Tr. 538).

On May 29, 2008, Patrick presented the orthopedic department at the VA complaining of left knee pain.  The examining physician noted that Patrick had previously been diagnosed with left knee patellar tendonitis.  Upon examination, the doctor found Patrick had no effusion, no pain with patellar grind, and no lateral joint line tenderness.  Patrick had some pain over the very posterior aspect of his medial joint line.  His range of motion was 0 to 130 degrees.  (Tr. 504).  Patrick's recent knee MRI indicated the suggestion of a possible lateral meniscal cyst, but there was no evidence of a meniscal tear.  His knee x-rays did not demonstrate a significant amount of arthritis. The doctor diagnosed Patrick with patellar tendonitis and ordered a neoprene knee sleeve and physical therapy.  (Tr. 504).

Also on May 29, 2008, Patrick presented to the internal medicine department of

15

the VA where he was examined by Dr. Colburn.  Patrick reported that he had run out of his Combivent and Albuterol inhalers one month prior, and was told he could not get anymore until June.  Patrick stated that he could walk one to two blocks before becoming short of breath.  He reported that he had intermittent left shoulder pain for the past five years that could be elicited by raising his arm above his head and reaching back.  Upon examination the doctor noted Patrick had 2+ pulses bilaterally, no edema, and a normal gait.  Patrick was unable to abduct to greater than 90 degrees with his left shoulder, and he had pain with external and internal rotation.  Patrick had 4/5 strength throughout his left arm and 5/5 strength on his right arm and both legs.  Examination of his chest and lungs revealed bilateral diffuse wheezing throughout.  (Tr. 510-511).

Dr. Colburn encouraged Patrick to obtain vocational rehabilitation because she did not feel he could perform jobs that required a lot of manual labor.  Dr. Colburn drafted a letter in which she stated that Patrick is under the care of the VA Medical Center and that, given his current medical problems, Patrick was unable to lift more than 10 pounds and was unable to walk more than two blocks before becoming short of breath.  (Tr. 512).

In July 2008, Dr. Colburn completed a residual functional capacity questionnaire. (Tr. 717-718).  She opined that Patrick was limited to lifting 10 pounds or less on an occasional basis due to weakness and pain in the left shoulder and severe COPD which was difficult to control with medications.  (Tr. 717).  Dr. Colburn opined that while Patrick had no sitting limitations, his standing/walking were limited to 4 hours out of an 8-hour day, and he would need frequent breaks due to breathing difficulty and pain.  (Tr. 717). She also opined that Patrick would need a sit/stand option.  (Tr.718).  Dr. Colburn noted

16

that Patrick may need frequent breaks due to difficulty breathing if the air conditioning were too high or if it were too hot.  (Tr. 717).  Dr. Colburn limited Patrick's climbing, stooping, crouching, kneeling, and crawling to a rare/never basis, and limited his balancing, reaching, handling, feeling, pushing/pulling, and gross manipulation to an occasional basis.  (Tr. 718).  She opined that Patrick needed to have limited exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise and fumes (Tr. 718).   She stated that Patrick experiences moderate pain in his knee and shoulder. She noted that Patrick had been prescribed a brace and a breathing machine.  (Tr. 717-718).

### C.  Hearing Testimony

Patrick testified that he earned a GED.  (Tr. 739).  He was discharged from his last job at Marymount hospital for sleeping on the job, but challenged the decision and received unemployment compensation.  (Tr. 741).  Patrick testified that his most serious problem is his asthma, which is worse with humidity or air conditioning.  (Tr. 746). Patrick uses a breathing machine and takes a number of medications.  (Tr. 750).  He can walk about two blocks before becoming short of breath.  (Tr. 750).  He can stand about 15 - 20 minutes.  (Tr. 761).  Sitting does not bother him, but his knee becomes stiff if he sits too long.  (Tr. 751).  He also has shoulder pain.  (Tr. 751).  Patrick testified that he can lift less than 5 pound with his left shoulder and less than 10 pounds with his right shoulder.  (Tr. 762).

Patrick testified that he had suffered from depression.  He had taken antidepressants in the past, but stopped because he did not like the side effects.  (Tr. 755).  He was doing fine off the antidepressants.  (Tr. 755).  Patrick testified that in the

past he drank and used drugs to medicate himself, but he had stopped drinking about a year before the hearing and stopped using drugs 17 months prior to the hearing.  (Tr. 754).  Patrick quit smoking about three months prior to the hearing.  (Tr. 749).  He has noticed that since he quit smoking he is able to hold his notes longer when he sings. (Tr. 772).

The VE testified that Patrick's past work included hospital cleaner, medium exertional level, unskilled; lead glass seamer, medium exertional level, unskilled; automobile tester, light exertional level, semi-skilled with no transferable skills; and stock clerk, performed at a light exertional level, semi-skilled.  (Tr. 780-781).

The ALJ asked the VE to consider an individual of the same age as Patrick, with the same education and work experience, who can lift and/or carry about 10 pounds frequently and 20 pounds occasionally; can push and pull to the same limits, except, he should engage in not more than occasional pushing and pulling with his lower extremities because of his knee pain.  He can sit about two hours out of an eight hour workday and stand and/or walk about six hours out of an eight hour workday.  He should not walk more than 10 minutes at a time because he becomes short of breath.  He cannot climbs ladders, ropes or scaffolds and can only occasionally climb stairs or ramps.  He can occasionally stoop, crawl, crouch or kneel.  He should not engage in repetitive overhead reaching with his left arm.  He should not work around temperature extremes or high humidity.  He is limited to low stress work meaning no high production quotas.

The VE testified that such an individual could not perform Patrick's past work. However, such an individual could work as a cashier-wrapper at the light unskilled level

18

for which there are 1,020,000 jobs nationally and 11,200 jobs regionally; or at the semi skilled level, for which there are 1,080,000 jobs nationally and approximately 11,000 jobs regionally.  He could also work as a retail sales person at the unskilled light level for which there are more that 190,000 jobs nationally and more than 2,200 jobs regionally; or at the semi-skilled level for which there are 1,978,000 jobs nationally and over 23,000 jobs regionally.  (Tr. 787-789).

The VE further testified that an individual that is limited to lifting 10 pounds or less, and is limited in standing/walking to four hours out of an eight hour workday, with a sit/stand option is limited to sedentary work.  (Tr. 789-790).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or

mental ability to do basic work activities." Third, if the claimant is not performing substantial

gainful activity, has a severe impairment that is expected to last for at least twelve months,

and the impairment meets a listed impairment, the claimant is presumed to be disabled

regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R.

§416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past

relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's

impairment does prevent her from doing her past relevant work, if other work exists in the

national economy that the claimant can perform, the claimant is not disabled.  *Abbott v.*

*Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social
> Security Act through December 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since
> April 12, 2005, the alleged onset date....
>
> 3. The claimant has the following severe impairments: chronic
> obstructive pulmonary disease (COPD), also diagnosed as asthma,
> status post removal of part of the left lung; diabetes mellitus;
> osteoarthritis of the joints, also diagnosed as tendonitis and bursitis;
> gastroesophageal reflux disease (GERD); depression; and
>                         polysubstance abuse, in remission by report of claimant....
>
> 4. The claimant does not have an  impairment or combination of
> impairments that meets or medically equals one of the listed
> impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and
> 416.926).
>
> 5. After careful consideration of the entire record, I find the claimant has
> the residual functional capacity to perform a reduced range of light work.
> He can lift and/or carry about 10 pounds frequently and 20 pounds
> occasionally. He can push and pull to the same limits, except he can only

occasionally push and pull with the lower extremities. In an 8-hour workday he can sit for about 2 hours, and stand and/or walk about 6 hours (standing and/or walking 10 minutes at a time). He cannot climb ladders, ropes or scaffolds. He can occasionally climb stairs or ramps, stoop, crouch, kneel, or crawl. He cannot engage in repetitive overhead reaching with the left arm. He cannot work around temperature extremes or high humidity, or high concentrations of dust, fumes and gases.  He is limited to low stress work, that is, work that does not involve high production quotas.

6. The claimant is unable to perform any past relevant work....

7. The claimant was born on August 5, 1956 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date....

8. The claimant has at least a high school education and is able to communicate in English....

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills....

10. Considering the claimant's age, education, work experience, and  residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform....

11. The claimant has not been under a "disability," as defined in the Social Security Act, from April 12, 2005 through the date of this decision....

(Tr. 18, 20, 21, 24, 25, 26).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial

21

evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Patrick alleges that the ALJ's decision is not supported by substantial evidence because the ALJ failed to accord controlling weight to the opinion of Patrick's treating physician, and because the ALJ failed to properly assess Patrick's residual functional capacity.  The Commissioner disputes these claims.

### A.  Treatment of Medical Opinions

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the

22

treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs., 803 F.2d 211, 212 (6th Cir. 1986).*  The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler, 821 F.2d 316 (6th Cir. 1987).*

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion.  20 C.F.R. §§ 404.1527(d) (2) and 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.  Failure to follow these procedural requirements denotes a lack of substantial evidence, even where the ALJ's conclusions

23

may be justified based on the record.  *Rogers v. Comm'r Soc. Sec.,* 486 F. 3d 234, 243 (6th Cir. 2007)

In this case, the record contains two opinions from Patrick's treating physician, Dr. Colburn .[3]   The first is a letter contained in the treatment notes from May 29, 2008 wherein Dr. Colburn opined that Patrick was limited to lifting no more than 10 pounds and was unable to walk more than one or two blocks before becoming short of breath. The second is an  RFC assessment completed on July 27, 2008.  The RFC assessment provides, among other things, that Patrick can occasionally lift 10 pounds or less; can stand or walk for four hours out of an eight hour workday; can only occasionally balance, reach, handle, feel, push/pull, and perform gross manipulation; and can rarely or never climb, stoop, crouch, kneel, or crawl.  Patrick argues that the ALJ's decision to reject these opinions is not supported by substantial evidence.  In addressing this argument, the Court will focus on the ALJ's analysis of Dr. Colburn's opinion.

In discussing Dr. Colburn's opinion, the ALJ does not address or even acknowledge the existence of the July 2008 RFC assessment.  Similarly, the ALJ fails to acknowledge or address some of the objective medical evidence supporting Dr. Colburn's opinion.  Specifically, the ALJ ignores Dr. Colburn's finding that Patrick has limited range of motion, pain, and weakness in his left shoulder.

The Commissioner does not address the ALJ's failure to acknowledge this

---

[3]The Commissioner argues that Dr. Colburn is not Patrick's treating physician because Patrick saw Dr. Colburn only two times, and because Dr. Colburn stated Patrick was under care at the VA Medical Center.  (Defendant's Brief p. 17).  The Commissioner is incorrect.  Because Patrick was under care at the VA Medical Center, the physicians therein are considered collectively to be his treating physicians. Moreover, the ALJ considered Dr. Colburn to be Patrick's treating physician.  (Tr. 23).

evidence.  Rather, he argues that the ALJ's decision to reject Dr. Colburn's opinion is supported by substantial evidence.   The Commissioner's argument is without merit.

An ALJ's failure to comply with 20 C.F.R. §§ 404.1527(d) (2) and 416.927 is reversible error regardless of whether substantial evidence otherwise supports his decision.  As recognized by the Court in *Wilson v. Comm'r Soc. Sec.*, 378 F. 3d 541, 546 (6th Cir. 2004):

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion, and thus a different outcome on remand is unlikely.... To hold otherwise and to recognize substantial evidence as a defense to non-compliance with § 1527 (d) (2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.

*See also*, *Rabbers v. Comm'r Soc. Sec.* 582 F.3d 647 (6th Cir. 2009) (discussing with approval *Wilson v. Comm'r Soc. Sec., supra.*).

In addition to the foregoing, the ALJ erred in substituting his medical opinion for that of the treating physician.  The ALJ states, "The evidence only shows the claimant underwent an MRI of the left knee and pulmonary function testing.[4]  The results of those tests would not limit the claimant to such restrictions."  (Tr. 23).  The ALJ does not cite to any medical opinion to support his conclusion, nor does he otherwise explain it.[5]

---

[4] As already discussed, this is an incorrect characterization of the evidence.

[5] Although it is far from clear, the ALJ may be relying upon the opinions of consultive examiner Dr. Gerblich and the RFC assessment completed by Dr. Caldwell. However, Dr. Gerblich's opinion and the RFC report were rendered prior to Patrick's most recent pulmonary function testing and prior to Patrick's knee MRI.  (Tr. 242-243, 504, 681).  Necessarily therefore, these opinions would not support the ALJ's conclusion that the pulmonary function testing and MRI do not support Dr. Colburn's

25

Accordingly, it appears the ALJ's decision is not supported by substantial evidence.  *See Simpson v. Comm'r Soc. Sec.* 2009 WL 2628355, *12 (C.A. 6 (Ohio)) (Where ALJ substituted his own opinion for that of treating physician, rejection of treating physician's opinion did not rest upon substantial evidence.); *Meece v. Barnhart*, 192 Fed. Appx, 456, 465 (6th Cir. 2006) (ALJ may not substitute his own judgment where opinion of treating physician is supported by the medical evidence.); *Rohan v. Chater*, 989 F. 3d 966, 970 (7th Cir. 1996) (ALJ must not succumb to temptation to play doctor and make own independent medical findings).  The ALJ's failure to articulate any cogent reason for rejecting the treating physician's opinion requires a remand.

### B. Patrick's Residual Functional Capacity

Patrick claims that the ALJ's RFC finding is not supported by substantial evidence.  Specifically, Patrick argues that the medical evidence supports greater exertional and non-exertional limitations than those provided for by the ALJ.  Regardless of whether substantial evidence supports the ALJ's RFC finding, the Court cannot uphold the ALJ's decision because the decision does not permit the Court to engage in informed judicial review.

An ALJ's decision, "must be based on consideration of all relevant evidence and the reasons for his conclusion must be stated in a manner sufficient to permit an informed review."  *Ray v. Bowen* 843 F. 2d 998, 1002 (7th Cir. 1988)  "[M]eaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence."  *Herron v. Shalala*, 19 F. 3d 329, 333 (7th Cir. 1994)  The Court

───────────────

opinion, which was rendered subsequent to these tests.

cannot uphold the decision of an ALJ, even when there may be sufficient evidence to support the decision, if, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F. 3d 305,307 (7th Cir. 1996).  The ALJ's decision in this case does not meet this standard.

After rejecting the treating physicians opinion, the ALJ summarizes the findings and opinions of two consultive examiners, each of whom examined Patrick.  Although required to do so[6], the ALJ did not articulate the weight given to either of these opinions.

The ALJ then refers to the residual functional capacity conclusions reached by the non-examining physicians employed by the state.  The ALJ recognized that more weight is generally given to an examining source than a non-examining source,[7] yet, based upon his RFC determination it appears the ALJ gave greater weight to the opinion of the non-examining state physicians than to the opinions of the consultive examiners.  Again, the ALJ gave no explanation for his decision.

Finally, the ALJ states, "After receipt of additional medical evidence and testimony, I find the new evidence provides the claimant with greater limitations." (Tr. 24).  The ALJ does not, however, identify the evidence or the limitations to which he refers.

As evidenced by the foregoing, the ALJ failed to comply with 20 C.F.R 404.1527 § (f) (2) (ii) and failed to otherwise adequately explain the basis for his decision.

---

[6] *See* 20 C.F.R 404.1527 § (f) (2) (ii).  (Unless the treating source's opinion is given controlling weight, the ALJ must explain the weight given to opinions of state agency consultants and other program physicians.)

[7] *See* 20 C.F.R 404.1527 § (d) (1) (Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.)

Accordingly, the Court cannot undertake meaningful judicial review of the ALJ's RFC determination.

### VII.  Decision

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is REVERSED and REMANDED.

IT IS SO ORDERED.                    s/*Nancy A. Vecchiarelli*
                                     Nancy A. Vecchiarelli
                                     U.S. Magistrate Judge


Date: January 29, 2010